Lindenmuller *v.* The People.

New trial granted.

[MONROE GENERAL TERM, December 3, 1860. *Smith, Johnson* and *Knox,* Justices.]

GUSTAV LINDENMULLER, plaintiff in error, *vs.* THE PEOPLE, defendants in error.

Every act done maliciously, tending to bring religion into contempt, may be punished at common law; and the christian sabbath, as one of the institutions of that religion, may be protected from desecration by such laws as the legislature, in their wisdom, may deem necessary to secure to the community the privilege of undisturbed worship, and to the day itself that outward respect and observance which may be deemed essential to the peace and good order of society and to preserve religion and its ordinances from open reviling and contempt.

Upon this ground the "Act to preserve the public peace and order on the first day of the week, commonly called Sunday," passed April 17, 1860, prohibiting exhibitions or dramatic performances on Sunday, can be sustained; the legislature being the sole judges of the acts proper to be prohib-

Lindenmuller *v.* The People.

ited, with a view to the public peace, and as obstructing religious worship, and bringing into contempt the religious institutions of the people.

That act is clearly *constitutional,* as dealing with and having respect to the sabbath as a civil and political institution, and not affecting to interfere with religious belief or worship, faith or practice.

In the state of New York the sabbath exists as a day of rest by the common law, and without the necessity of legislative action to establish it; and all that the legislature attempt to do in the " sabbath laws," is to regulate its observance.

ERROR to the court of oyer and terminer of the city and county of New York. On the 5th day of July, 1860, the defendant was indicted in that court for an alleged misdemeanor in giving theatrical exhibitions on Sunday, the 20th day of May, 1860, contrary to the provisions of the " Act to preserve the public peace and order on the first day of the week, commonly called Sunday," passed April 17, 1860, (*Laws of* 1860, *p.* 999.) On the 17th of November, 1860, the defendant was arraigned on said indictment, in the court of oyer and terminer, and pleaded not guilty thereto. The issue so joined came on to be tried on the same day, before Hon. GEORGE GOULD, a justice of the supreme court, and a jury duly impanneled to try said issue. The prosecution gave evidence tending to show that on the 20th day of May, 1860, the same being a Sunday, the defendant did exhibit a dramatic performance at the premises Nos. 199 and 201, Bowery, in the city of New York, the said premises being used in part as a theatrical establishment of which the defendant was the proprietor. It also appeared from the testimony, that the defendant, on the 11th day of April, 1860, by indenture in writing, hired from one Edward Hamann, landlord, the above described premises for a term of twenty-two weeks, commencing on the 16th day of April, 1860, at the weekly rent of $110; and that he hired the said premises for the purpose expressly of giving dramatic entertainments therein daily, including all the Sundays during the said term, and that the only profit accruing to the defendant from said hiring, was derived from dramatic representations given on

the said premises on Sundays. That during the week the receipts were not sufficient to pay the expenses, but on Sundays largely exceeded the expenses; that the receipts on Sundays were more than during the other six days of the week. After the testimony on both sides was closed, the counsel for defense and prosecution respectively summed up the case to the jury. The counsel for the defendant asked the court to direct the jury to acquit the defendant, on the ground that the act under which the indictment was framed was unconstitutional and void. The court refused so to direct the jury, but on the contrary charged the jury that said act was constitutional and valid. To which charge the counsel for the defendant excepted. The jury rendered a verdict of "Guilty."

*H. L. Clinton* and *Jas. T. Brady*, for the plaintiff in error. I. The law in question is in violation of section 6, article 1 of the constitution of this state, which provides that "no person shall be deprived of life, liberty or property, without due process of law." The effect of the law in question is to deprive citizens of their property, without due process of law. The inevitable result of this statute to work a destruction of property is well illustrated in this case. And the effect of it is to destroy entirely the value of the lease of the plaintiff in error, as well as to render useless the building he hired, which was erected for the purpose of giving dramatic exhibitions. The right of the legislature to destroy private property, "without due process of law," is distinctly involved in this case. The principles which underlie the objections to the constitutionality of this law are recognized and illustrated in a variety of adjudged cases. This act does not discriminate between contracts made prior to its passage and those entered into subsequently. The plaintiff in error obtained his lease prior to the passage of this act. It has been repeatedly held that statutes, (the effect of which is to destroy or greatly deteriorate property, and thus impair the obligation of con-

tracts,) that *do not discriminate between existing contracts and those subsequently made,* are unconstitutional and void. A state bankrupt or insolvent law, which discharges a debtor from all liability for any debt contracted before such law was passed, on his surrendering his property in the manner it prescribes, is void, as it impairs the obligation of contracts. (*Sturgis* v. *Crowninshield,* 4 *Wheat.* 122. *Boardman* v. *Deforest,* 5 *Conn. Rep.* 1. *Farmers &c. Bank* v. *Smith,* 6 *Wheat.* 133. *Roosevelt* v. *Cebra,* 17 *John.* 108. *Kimberly* v. *Ely,* 6 *Pick.* 451. *Betts* v. *Bagley,* 12 *id.* 572. *Smith* v. *Mead,* 3 *Conn. Rep.* 253. *Hammet* v. *Anderson, Id.* 304. *Midbury* v. *Hopkins, Id.* 472. *Hempstead* v. *Reed,* 6 *id.* 480. *Hinchley* v. *Marean,* 3 *Mason,* 88. *See also. Quackenbush* v. *Danks,* 1 *Denio,* 128; *affirmed in court of appeals,* 3 *id.* 594; *Snyder* v. *Snyder,* 3 *Barb.* 621; *Holmes* v. *Holmes,* 4 *id.* 295; *White* v. *White,* 5 *id.* 474; *Westervelt* v. *Gregg,* 2 *Kern.* 202; *Norris* v. *Beyea,* 3 *id.* 273.)

We insist that so long as the plaintiff in error conducted proceedings at his theater in an orderly manner, did nothing calculated to produce a breach of the peace, or to disturb his neighbors, or those in his vicinity, he had a legal right to give theatrical exhibitions on Sunday. It was purely a matter of taste and conscience with him and his auditors. (*See per Barculo, J.* 4 *Barb.* 71, 75; *Taylor* v. *Porter,* 4 *Hill,* 144; *Sackett* v. *Andross,* 5 *id.* 362; *People* v. *Toynbee,* 20 *Barb.* 195; *Wynehamer* v. *People,* 3 *Kern.* 396; *People* v. *Draper,* 15 *N. Y. Rep.* 562; *Powers* v. *Bergen,* 2 *Selden,* 367.)

It may be contended that theatrical exhibitions upon Sunday are productive of evil, and for that reason the objections raised as to the unconstitutionality of the law are untenable. Over a question of morals like this, the legislature has no jurisdiction. (*See remarks of Comstock, J. in Wynehamer* v. *The People,* 3 *Kern.* 384.)

It is idle to contend that Lindenmuller's property was not destroyed because he had a right to use it during other days of the week than Sunday. Such use was incidental, and of

little or no practical value. It was proved that during the week the receipts were not sufficient to pay the expenses, but on Sunday largely exceeded the expenses; the receipts on Sundays were more than during the other six days of the week. At the time Lindenmuller obtained his lease, (11th of April, 1860,) it was not unlawful to give theatrical exhibitions on Sunday. It is provided by 2 *R. S.* 675, § 70, that "there shall be no shooting, hunting, fishing, sporting, playing, horse-racing, gaming, frequenting of tippling houses, or any unlawful exercises or pastimes, on the first day of the week, called Sunday." * * * "Nor shall there be any servile laboring and working on that day, excepting works of necessity or charity, unless done by some person who uniformly keeps the last day of the week, called Saturday, as holy time, and does not labor or work on that day, and whose labor shall not disturb other persons in their observance of the first day of the week as holy time." Without discussing the constitutionality of this statute, it is sufficient to say that it does not apply to giving theatrical exhibitions on Sunday. In April, 1860, there was no statute of this state that could apply to such exhibitions. (*See Sayles* v. *Smith,* 12 *Wend.* 57; *Boynton* v. *Page,* 13 *id.* 425; *Miller* v. *Roessler,* 4 *E. D. Smith,* 234; *Shank* v. *Shoemaker,* 18 *N. Y. Rep.* 489.) It is clear from these authorities that, inasmuch as no law of this state prohibited dramatic exhibitions on Sunday, at the time Lindenmuller obtained his lease, April 11th, 1860, and inasmuch as the statute in question (passed April 17th, 1860) does not discriminate between the rights of property which vested before its passage, and those thereafter acquired, it is unconstitutional and void.

II. The statute in question is in violation of section 10 of article 1 of the constitution of the United States, which provides that no state shall pass any law "impairing the obligation of contracts. (*See authorities cited under Point I.*) We have already shown that the effect of this law is to destroy substantially Lindenmuller's lease—to render it entirely

useless for the purpose for which it was obtained—to leave him only the " occasional and incidental" use of it, which might remain after it was substantially destroyed. Lindenmuller having obtained his lease before the passage of this law, and when it was legal to give theatrical exhibitions on Sunday, had a right to make contracts, extending long after the passage of the law, with actors to perform on that day. The effect of this statute is not only to impair " the obligation of contracts " such as these, but to *annihilate* them. In determining the point whether a statute conflicts with the constitution of the United States for the reason that it impairs the " obligation of contracts," the principal inquiry is, does it impair or destroy a contract, legal at the time it was made ? It has been repeatedly adjudged that laws which produce this effect are unconstitutional and void. After the contract is once complete, it impairs its obligation to impose conditions, and this the constitution prohibits. Any provision of the statute, substantially defeating the end contemplated by the parties to the contract, must impair its obligation. This obligation must depend upon the law as it was, *when the contract was made.* The legislature cannot, therefore, by a subsequent act, impair its " obligation" by requiring the performance of other conditions not required by the law of the contract. (*See Robinson* v. *Magie,* 9 *Cal. R.* 81 ; *Moore* v. *Fowler,* 1 *Hemp.* 536 ; *Smith* v. *Moore,* 2 *Cal. Rep.* 524 , *Jamison* v. *Planters and Mechan. Bank,* 23 *Ala. Rep.* 168 ; *Winter* v. *Jones,* 10 *Geo. Rep.* 190 ; *Benson* v. *Mayor of New York,* 10 *Barb.* 223 ; *Chesnut* v. *Shane,* 16 *Ohio Rep.* 599 ; *Townsend* v. *Townsend, Peck,* 1 ; *January* v. *January,* 7 *Monroe,* 544.) Inasmuch as the law recognized the contracts of Lindenmuller, referred to, when they were made, *that law formed a part of those contracts.* The statute which impairs and destroys those contracts is therefore unconstitutional.

III. The statute in question is not valid on the ground that it is a police regulation. The effect of this statute is to

work a destruction of property, and to destroy contracts entered into prior to its passage, which when made were lawful. In the case of *Wynehamer* v. *The People,* (3 *Kernan,* 378,) it was contended that the " act for the prevention of intemperance, pauperism and crime," passed April 9th, 1855, was constitutional, on the ground that it came within the scope of police power. The court held that this statute passed " the utmost boundaries of mere regulation and police ;" that it caused " the essential loss or destruction of property," and was therefore unconstitutional. The same is true of the Sunday act. There was infinitely more reason for holding that the liquor law was maintainable as a police regulation, than for maintaining that the Sunday act is sustainable on that ground. By the 25th section of the liquor law, all liquor kept in violation of the act was " declared to be a public nuisance." It was with no little show of reason contended, that what was thus denominated a " nuisance," came within the police power. Yet this notion was strongly rebuked by the supreme court and the court of appeals. (*See remarks of Brown, J. in People* v. *Toynbee,* 20 *Barb.* 199.) If the property of Lindenmuller can be destroyed under the pretext of *regulating* the enjoyment of it, or upon the alleged authority of police jurisdiction over it, then others may be stripped of their property, as well as " *deprived of liberty by a legislative act, proscribing them as malefactors and felons.*" To use the language of Justice Brown, " Grant this power to the legislature, and the limitations of the constitution are no longer of any *value.* Every kind of property may be put without the pale of the laws and the protection of the courts." See also the observations of Strong, J. upon the subject of the boundary of the police regulations, in the case of *The People* v. *Toynbee,* (20 *Barb.* 217.)

IV. This statute is unconstitutional, because it is in violation of article 1, section 3 of the constitution of the state of New York, which provides that " The free exercise and enjoyment of religious profession and worship, without *discrim-*

*ination* or preference, shall for ever be allowed in this state to all mankind." The effect of this statute is to discriminate in favor of those who keep the *first*, in contradistinction to those who keep the *seventh* day of the week. This statute cannot be successfully maintained, on the ground that christianity is a part of the common law of the state, and therefore the legislature has a right to enact laws for its due observance. Christianity is not a part of the common law of this country, there being here no union of church and state as in England.

In the case of *Bloom* v. *Richards,* (2 *Ohio R.* 390,) it was expressly held that neither christianity nor any other system of religion formed a part of the law of that state. The constitutional provision in that state was similar to the one in the state of New York. Could any doubt exist upon this subject, as to the intention of the framers of the constitution to recognize christianity or any distinctive religion, such doubt is entirely removed by section 3 of article 1, which provides that " No person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief." It has been held by the supreme court of California, that the act of April, 1858, for the better observance of the sabbath, was unconstitutional and void—as a violation of religious freedom by enforcing the compulsory observance of a day, held sacred by believers in one religion, and thus discriminating in its favor. (*Ex parte Newman,* 9 *Cal. Rep.* 502.) This law was held to be in violation of the section of the constitution of that state, which provided that " The free exercise and enjoyment of religious professions and worship, without discrimination or preference, shall forever be allowed." Thus, it will be seen, that the constitutional provision, which it was held that this law violated, is identical with the provision in our constitution, upon which the counsel for the plaintiff in error rely. The court hold, that the legislature has no power to enforce religious observances.

The statute of April 17th, 1860, is unconstitutional, the conviction under it is illegal, and a new trial should be granted.

*J. H. Anthon* and *N. J. Waterbury*, (district attorney,) for the people. I. The law in question is not in conflict with any provisions in regard to the rights of religious liberty. (1.) Christianity was part of the common law of England at the revolution, and in consequence the observance of Sunday was imperative. (4 *Black. Comm.* 63. *Dickenson's Quarter Sessions*, 387. 1 *East's P. C. ch.* 1, § 33.) And upon the same principle indictments were framed for blasphemy at common law. (*Reg.* v. *Carlile*, 3 *Barn. & Ald.* 161. *Rex* v. *Atwood*, *Cro. Jac.* 421. *Rex* v. *Williams*, 26 *Howell's State Trials*, 654. *Rex* v. *White, Leach*, 430.) (2.) The law thus existing, with such other portions of the common law of England as were permanent in their nature and did not relate to the royal prerogative, were, by the constitution of 1776, continued in force, except such portions thereof as might "be construed to *establish or maintain* any *particular denomination* of christians, or their ministers," (*Const.* 1776, § 35,) which does not apply to this case, and the declaration of religious toleration (article 38) re-enacted in both of the subsequent constitutions. (3.) Under the constitution of 1776, christianity continued to be part of the common law of the state. (*People* v. *Ruggles*, 8 *John.* 290.) (4.) The same law continued to prevail under the constitution of 1823, which was framed after full consideration of the case of the *People* v. *Ruggles* and a proposition to reverse its doctrines. (*Journal of Con. p.* 463.) (5.) The constitution of 1846 only altered the common law by removing all disability from religious belief in witnesses. (*Const.* 1846, *art.* 1, § 111.) (6.) The provision in article 1, § 3, does not do more than prevent the establishment by law of any denomination of christians, or the persecution or disability of dissenters. (*Preamble to art.* 38, *Const. of* 1776.)

II. Under this constitution, and identical provisions in other states, the peculiar character of the first day of the week has been recognized, either as a religious observance or without reference to any religious character, as a day of rest

by a series of statutes and decisions too uniform and extensive to be questioned. (1 *R. S.* 430, *and* 3 *R. S.* 692, *as to the form of the witness' oath.* 2 *R. S.* (*4th ed.*) 83, *as to process.* 1 *R. L. p.* 194, *religious meeting.* 2 *R. S. 4th ed.* 81, 464 *and* 350, *as to courts. Johnson* v. *Commonwealth,* 10 *Barr,* 102. *State* v. *Ambs,* 20 *Mis.* 214. *Shover* v. *State,* 5 *Eng.* 259. *Smith* v. *Wilcox,* 19 *Barb.* 581. *S. C.,* 25 *id.* 341. *Story* v. *Elliot,* 8 *Cowen,* 27. *Palmer* v. *City of New York,* 2 *Sand.* 318. *Watts* v. *Van Ness,* 1 *Hill,* 76. *Bissell* v. *Bissell,* 11 *Barb.* 96.)

III. The law for the preservation of the peace, &c. on Sunday, is simply prohibitory of a nuisance, and the appellants cannot assume that it has any other motive than to secure from a nuisance a large majority of the citizens.

IV. The case does not show, nor can the court see, what "free exercise of religious profession or worship" is or can be restrained or interfered with by the acts specified in the law.

V. The law does not take away private property. To make a law unconstitutional on this ground, it is not enough that it impairs the value of property in ever so great a degree, because this destroys no right. It leaves to the owner unimpaired his right to keep, to use, and dispose of the article. It does not therefore deprive him of any right of property.

All regulations of trade with a view to the public interest may more or less impair the value of property, but they do not come within the constitutional inhibition unless they virtually take away and destroy those rights in which property consists; this destruction must be, for all substantial purposes, total. (*Wynehamer* v. *The People,* 3 *Kern.* 378. 3 *Story's Cons. Law,* 163. *Vanderbilt* v. *Adams,* 7 *Cowen,* 348. *People* v. *Walbridge,* 6 *id.* 512. *City of New York* v. *Miln,* 11 *Peters,* 101.)

VI. The police laws of a state necessarily work individual disadvantage by prohibiting particular uses of property, but unless they affect the right of property itself, they are con-

stitutional, and the legislature is the only judge of their expediency.

VII. The accidental fact that the law which left the defendant's property untouched, and his use of it uncontrolled except for a particular purpose on a particular day, has pecuniarily injured him, because he, in his own mind, contemplated advantage from the prohibited use, cannot affect the question of the power of the legislature; nor can pecuniary loss consequential upon legislation otherwise good, alter its character.

VIII. The power of the state legislature, except as controlled by the constitution of the United States and the state of New York, is supreme. It has all the powers of legislation not taken from it by those instruments. (*People v. Draper,* 15 *N. Y. Rep.* 533. *S. C.,* 25 *Barb.* 344. *People* v. *Morrell,* 21 *Wend.* 563.)

*Brady,* in reply. I. Christianity was never in fact part of the *common law* of England; for the common law is entirely the work of men—a mere civil and juridical system for human government on earth. The *established religion* in England is in fact part of the constitution or government. It is for this reason that a libel upon it is indictable.

II. But however that may be, as to England, christianity is not part either of our law or government; for to make it such would be to give it a preference over the Jewish creed, which would be inconsistent with the constitution and bill of rights. And the present constitution, in abolishing all religious tests for witnesses, has declared that no religion as such is any part either of our law or government.

III. The compulsory observance of the first day of the week is not necessarily a part of christianity; nor does the power to enforce such observance arise from any recognition of christianity. Like other legislative power, it emanates from the constitution. If the legislature can compel the observance of the christian sabbath, this is an enforcement by

Lindenmuller *v*. The People.

law of that tenet of the christian faith which holds the first
day of the week to be that which the commandment refers to.
This is giving a preference, especially as, while the Jew is
compelled to observe our sabbath, we are legally authorized
utterly to disregard his. And if the legislature can thus
legislate against the Jew as to one tenet, why not as against
any other, and treat the ceremonies of the synagogue as ille-
gal because they conflict with the rites of christianity.
These remarks apply to seventh-day Baptists, whose ad-
herence to that day as the sabbath has been recognized and
protected by statute. (*See 6th subdivision of respondents'
first point.*)

IV. It may be that police laws can be passed regulating,
perhaps entirely prohibiting, theatrical performances on *any*
day of the week; but such law, to be operative, must not
give directly or indirectly any such preference as is above
stated. The effect of such a statute on the Jewish lessee of
a theater who conscientiously regarded his own sabbath,
would be to deprive him of the enjoyment of his property for
*two* days of the week, the christian being only so deprived on
*one*. Such a distinction is both unconstitutional and unjust.

V. But even such a law as is last suggested would be a
violation of a vested right, and of property, if it made no
distinction between existing and future acquisitions. The
free use of property is involved in the very idea of property,
as shown in the cases which Mr. Clinton has collected.

VI. The law cannot be justified as a police regulation. A
theatrical exhibition, properly conducted, is not a nuisance.
It may be as quiet, if not as moral, as an oratorio. It does
not create- nor tend to any breach of public order. It may
be full of excellent moral instruction. The regulation of
such a performance, so as to prevent its being a nuisance,
would be a police regulation. To prohibit it altogether is
not a police regulation, any more than preventing usury. It
is only an exercise of absolute sovereign power.

VII. But either by or under pretense of a police regulation,

the legislature cannot pass a law destroying the valuable enjoyment of property leased for a lawful use, which use the act makes entirely illegal. This impairs a contract, impairs the right of property and takes away a vested right. The right of the landlord may also be said, in one sense, to be impaired, as his chance to obtain the rent may be lessened if not destroyed by the tenant's inability to use the premises for the purpose for which they were hired.

VIII. But if, as a police regulation or otherwise, such an act as the one in question may be passed, and vested rights or property impaired, it must be on condition of providing for compensation to the party whose right or property is thus impaired. Suppose, in this connection, leasing premises to be used for a tannery, or cotton factory, which was a lawful pursuit when the lease was made, but the carrying on of either in the city being prohibited by the act. Could a Jew be indicted and convicted even for uttering the words held in 8th Johnson (*The People* v. *Ruggles*, 8 *John.* 291) to be blasphemous? (*See Vidal and others* v. *Girard's Ex'rs*, 2 *How. S. C. Rep.* 198.)

*By the Court,* ALLEN, J. The constitutionality of the law under which Lindenmuller was indicted and convicted does not depend upon the question whether or not christianity is a part of the common law of this state. Were that the only question involved, it would not be difficult to show that it was so, in a qualified sense—not to the extent that would authorize a compulsory conformity in faith and practice, to the creed and formula of worship of any sect or denomination, or even in those matters of doctrine and worship common to all denominations styling themselves christian, but to the extent that entitles the christian religion and its ordinances to respect and protection, as the acknowledged religion of the people. Individual consciences may not be enforced; but men of every opinion and creed may be restrained from acts which interfere with christian worship, and which tend to

Lindenmuller *v.* The People.

revile religion and bring it into contempt. The belief of no man can be constrained, and the proper expression of religious belief is guarantied to all; but this right, like every other right, must be exercised with strict regard to the equal rights of others; and when religious belief or unbelief leads to acts which interfere with the religious worship, and rights of conscience of those who represent the religion of the country, as established, not by law, but by the consent and usage of the community, and existing before the organization of the government, their acts may be restrained by legislation, even if they are not indictable at common law. Christianity is not the legal religion of the state, as established by law. If it were, it would be a civil or political institution, which it is not; but this is not inconsistent with the idea that it is in fact, and ever has been, the religion of the people. This fact is every where prominent in all our civil and political history, and has been, from the first, recognized and acted upon by the people, as well as by constitutional conventions, by legislatures and by courts of justice.

It is not disputed that christianity is a part of the common law of England; and in *Rex* v. *Woolston,* (*Str.* 834,) the court of king's bench would not suffer it to be debated, whether to write against christianity in general was not an offense punishable in the temporal courts at common law. The common law, as it was in force on the 20th day of April, 1777, subject to such alterations as have been made, from time to time, by the legislature, and except such parts of it as are repugnant to the constitution, is, and ever has been, a part of the law of the state. (*Const. of* 1846, *art.* 1, § 17; *Const. of* 1821, *art.* 7, § 13; *Const. of* 1777, § 25.) The claim is, that the constitutional guaranties for the free exercise and enjoyment of religious profession and worship are inconsistent with and repugnant to the recognition of christianity, as the religion of the people entitled to, and within the protection of, the law. It would be strange that a peo-

ple, christian in doctrine and worship, many of whom or whose forefathers had sought these shores for the privilege of worshipping God in simplicity and purity of faith, and who regarded religion as the basis of their civil liberty, and the foundation of their rights, should, in their zeal to secure to all the freedom of conscience which they valued so highly, solemnly repudiate and put beyond the pale of the law, the religion which was dear to them as life, and dethrone the God who, they openly and avowedly professed to believe, had been their protector and guide as a people. Unless they were hypocrites, which will hardly be charged, they would not have dared, even if their consciences would have suffered them, to do so. Religious tolerance is entirely consistent with a recognized religion. Christianity may be conceded to be the established religion, to the qualified extent mentioned, while perfect civil and political equality, with freedom of conscience and religious preference, is secured to individuals of every other creed and profession. To a very moderate and qualified extent, religious toleration was secured to the people of the colony, by the charter of liberties and privileges, granted by his royal highness to the inhabitants of New York and its dependencies in 1683, (2 *R. L. app. No.* 2,) but was more amply provided for in the constitution of 1777. It was then placed substantially upon the same footing on which it now stands. The constitution of 1777, § 38, ordained that the free exercise and enjoyment of religious profession and worship, without discrimination or preference, should for ever thereafter be allowed, *provided* that the liberty of conscience thereby guarantied should not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of the state. The same provision was incorporated in the constitution of 1821, art. 7, § 3, and in that of 1846, art. 1, § 3. The convention that framed the constitution of 1777 ratified and approved the declaration of independence, and prefixed it to the constitution as a part of the preamble; and in that instrument a direct and solemn

appeal is made " to the Supreme Judge of the world," and a " firm reliance on the protection of Divine Providence" for the support of the declaration is deliberately professed. The people, in adopting the constitution of 1821, expressly acknowledged with "gratitude the grace and beneficence of God," in permitting them to make choice of their form of government; and in ratifying the constitution of 1846, declare themselves " grateful to Almighty God" for their freedom. The first two constitutions of the state, reciting that " ministers of the gospel are by their profession dedicated to the service of God and the cure of souls, and ought not to be diverted from the great duties of their function," declared that no " minister of the gospel or priest of any denomination whatsoever should be eligible to or hold any civil or military office within the state ;" and each of the constitutions has required an oath of office from all except some of the inferior officers taking office under it.

These provisions and recitals very clearly recognize some of the fundamental principles of the christian religion, and are certainly very far from ignoring God as the supreme ruler and judge of the universe, and the christian religion as the religion of the people, embodying the common faith of the community, with its ministers and ordinances, existing without the aid of, or political connection with, the state, but as intimately connected with a good government, and the only sure basis of sound morals.

The several constitutional conventions also recognize the christian religion as the religion of the state, by opening their daily sessions with prayer, by themselves observing the christian sabbath, and by excepting that day from the time allowed to the governor for returning bills to the legislature.

Different denominations of christians are recognized, but this does not detract from the force of the recognition of God as the only proper object of religious worship, and the christian religion as the religion of the people, which it was not intended to destroy, but to maintain. The intent was to pre-

vent the unnatural connection between church and state, which had proved as corrupting and detrimental to the cause of pure religion as it had been oppressive to the conscience of the individual. The founders of the government and the framers of our constitutions believed that christianity would thrive better, that purity in the church would be promoted, and the interests of religion advanced, by leaving the individual conscience free and untrammeled, precisely in accordance with the "benevolent principles of rational liberty," which guarded against "spiritual oppression and intolerance;" and "wisdom is justified of her children" in the experiment, which could hardly be said if blasphemy, sabbath-breaking, incest, polygamy and the like were protected by the constitution. They did, therefore, prohibit the establishment of a state religion, with its enabling and disabling statutes, its test oaths and ecclesiastical courts, and all the pains and penalties of nonconformity, which are only snares to the conscience, and every man is left free to worship God according to the dictates of his own conscience, or not to worship him at all, as he pleases. But they did not suppose they had abolished the sabbath as a day of rest for all, and of christian worship for those who were disposed to engage in it, or had deprived themselves of the power to protect their God from blasphemy and revilings, or their religious worship from unseemly interruptions. Compulsory worship of God in any form is prohibited, and every man's opinion on matters of religion, as in other matters, is beyond the reach of law. No man can be compelled to perform any act or omit any act as a duty to God; but this liberty of conscience in matters of faith and practice is entirely consistent with the existence, in fact, of the christian religion, entitled to and enjoying the protection of the law as the religion of the people of the state, and as furnishing the best sanctions of moral and social obligations. The public peace and public welfare are greatly dependent upon the protection of the religion of the country, and the preventing or punishing

of offenses against it, and acts wantonly committed subversive of it. The claim of the defense, carried to its necessary sequence, is, that the bible and religion, with all its ordinances, including the sabbath, are as effectually abolished as they were in France during the revolution, and so effectually abolished that duties may not be enforced as duties to the state, because they have been heretofore associated with acts of religious worship or connected with religious duties. A provision similar to ours is found in the constitution of Pennsylvania; and in *Vidal* v. *Girard's Executors*, (2 *How.* 127,) the question was discussed whether the christian religion was a part of the common law of that state; and Justice Story, in giving judgment, at page 198, after referring to the qualifications in the constitution, says : " So that we are compelled to admit, that although christianity be a part of the common law of the state, yet it is so in this qualified sense, that its divine origin and truth are admitted, and therefore it is not to be maliciously and openly reviled and blasphemed against, to the annoyance of believers or the injury of the public." The same principle was decided by the state court in *Updegraph* v. *Commonwealth*, (11 *S. & R.* 394.) The same is held in Arkansas, (*Show* v. *State,* 5 *Eng.* 259.) In our own state, in *People* v. *Ruggles,* (8 *John.* 291,) the court held that blasphemy against God, and contumelious reproach and profane ridicule of Christ or the holy scriptures, were offenses punishable at the common law in this state as public offenses. Chief Justice Kent says that to revile the religion professed by almost the whole community is an abuse of the right of religious opinion and free discussion secured by the constitution, and that the constitution does not secure the same regard to the religion of Mahomet or of the grand lama as to that of our Saviour, for the plain reason that we are a christian people, and the morality of the country is deeply engrafted upon christianity. He says, further, that the constitution " will be fully satisfied by a free and universal toleration, without any of the tests, disabilities or discriminations inci-

dent to a religious establishment. To construe it as breaking down the common law barriers against licentious, wanton and impious attacks upon christianity itself, would be an enormous perversion of its meaning."

This decision gives a practical construction to the "toleration" clause in the state constitution, and limits its effect to a prohibition of a church establishment by the state, and of all "discrimination or preference" among the several sects and denominations in the "free exercise and enjoyment of religious profession and worship." It does not, as interpreted by this decision, prohibit the courts or the legislature from regarding the christian religion as the religion of the people, as distinguished from the false religions of the world. This judicial interpretation has received the sanction of the constitutional convention of 1821, and of the people of the state in the ratification of that constitution, and again in adopting the constitution of 1846.

It was conceded in the convention of 1821 that the court in *People* v. *Ruggles* did decide that the christian religion was the law of the land, in the sense that it was preferred over all other religions, and entitled to the recognition and protection of the temporal courts by the common law of the state; and the decision was commented on with severity by those who regarded it as a violation of the freedom of conscience and equality among religionists secured by the constitution. Mr. Root proposed an amendment to obviate that decision, alleged by him to be against the letter and spirit of the constitution, to the effect that the judiciary should not declare any particular religion to be the law of the land. The decision was vindicated as a just exponent of the constitution and the relation of the christian religion to the state; and the amendment was opposed by Chancellor Kent, Daniel D. Tompkins, Col. Young; Mr. Van Buren, Rufus King and Chief Justice Spencer, and rejected by a large majority, and the former provision retained, with the judicial construction in *People* v. *Ruggles* fully recognized. (*N. Y. State Conv.*

*of* 1821, 462, 574.)   It is true that the gentlemen differed in their views as to the effect and extent of the decision, and as to the legal status of the christian religion in the state.   One class, including Chief Justice Spencer and Mr. King, regarded christianity—the christian religion as distinguished from Mahomedanism, &c.—as a part of the common law adopted by the constitution; while another class, in which were included Chancellor Kent and Mr. Van Buren, were of the opinion that the decision was right, not because christianity was established by law, but because christianity was in fact the religion of the country, the rule of our faith and practice, and the basis of public morals.   According to their views, as the recognized religion of the country, " the duties and injunctions of the christian religion" were interwoven with the law of the land, and were part and parcel of the common law, and that " maliciously to revile it is a public grievance, and as much so as any other public outrage upon common decency and decorum."   (*Per Ch. Kent, in debate, page* 576.)   This difference in views is in no sense material, as it leads to no difference in practical results and conclusions.   All agreed that the christian religion was engrafted upon the law, and entitled to protection as the basis of our morals and the strength of our government, but for reasons differing in terms and in words rather than in substance.   Within the principle of the decision of *The People* v. *Ruggles,* as thus interpreted and approved and made a part of the fundamental law of the land by the rejection of the proposed amendment, every act done maliciously, tending to bring religion into contempt, may be punished at common law, and the christian sabbath, as one of the institutions of that religion, may be protected from desecration by such laws as the legislature, in their wisdom, may deem necessary to secure to the community the privilege of undisturbed worship, and to the day itself that outward respect and observance which may be deemed essential to the peace and good order of society, and to preserve religion and its ordinances from open reviling and contempt—

and this not as a duty to God, but as a duty to society and to the state. Upon this ground the law in question could be sustained, for the legislature are the sole judges of the acts proper to be prohibited, with a view to the public peace, and as obstructing religious worship, and bringing into contempt the religious institutions of the people.

But as a civil and political institution, the establishment and regulation of a sabbath is within the just powers of the civil government. With us, the sabbath, as a civil institution, is older than the government. The framers of the first constitution found it in existence; they recognized it in their acts, and they did not abolish it, or alter it, or lessen its sanctions or the obligations of the people to observe it. But if this had not been so, the civil government might have established it. It is a law of our nature that one day in seven must be observed as a day of relaxation and refreshment, if not for public worship. Experience has shown that the observance of one day in seven as a day of rest " is of admirable service to a state, considered merely as a civil institution." (4 *Bl. Com.* 63.) We are so constituted, physically, that the precise portion of time indicated by the decalogue must be observed as a day of rest and relaxation, and nature, in the punishment inflicted for a violation of our physical laws, adds her sanction to the positive law promulgated at Sinai. The stability of government, the welfare of the subject and the interests of society, have made it necessary that the day of rest observed by the people of a nation should be uniform, and that its observance should be to some extent compulsory, not by way of enforcing the conscience of those upon whom the law operates, but by way of protection to those who desire and are entitled to the day. The necessity and value of the sabbath is acknowledged by those not professing christianity. In December, 1841, in the French chamber of deputies, an Israelite expressed his respect for the institution of the Lord's day, and opposed a change of law which would deprive a class of children of the benefit of it; and in 1844,

the consistory general of the Israelites, at Paris, decided to transfer the sabbath of the Jews to Sunday. A similar disposition was manifested in Germany. (*Baylee's Hist. of Sab.* 187.) As a civil institution, the selection of the day is at the option of the legislature; but for a christian people, it is highly fit and proper that the day observed should be that which is regarded as the christian sabbath, and it does not detract from the moral or legal sanction of the law of the state that it conforms to the law of God, as that law is recognized by the great majority of the people. In this state the sabbath exists as a day of rest by the common law; and without the necessity of legislative action to establish it; and all that the legislature attempt to do in the "sabbath laws" is to regulate its observance. The body of the constitution recognized Sunday as a day of rest, and an institution to be respected by not counting it as a part of the time allowed to the governor for examining bills submitted for his approval. A contract, the day of the performance of which falls on Sunday, must, in the case of instruments on which days of grace are allowed, be performed on the Saturday preceding, and in all other cases on Monday. (*Salter* v. *Burt,* 20 *Wend.* 205. *Avery* v. *Stewart,* 2 *Conn. R.* 69.) Compulsory performance on the sabbath cannot be required, but the law prescribes a substituted day. Redemption of land, the last day for which falls on Sunday, must be made the day before. (*People* v. *Luther,* 1 *Wend.* 42.) No judicial act can be performed on the sabbath, except as allowed by statute, while ministerial acts not prohibited are not illegal. (*Sayles* v. *Smith,* 12 *Wend.* 57. *Butler* v. *Kelsey,* 15 *John.* 177. *Field* v. *Park,* 20 *id.* 140.) Work done on a Sunday cannot be recovered for, there being no pretense that the parties keep the last day of the week, and the work not being a work of necessity and charity. (*Watts* v. *Van Ness,* 1 *Hill,* 76. *Palmer* v. *City of New York,* 2 *Sand.* 318. *Smith* v. *Wilcox,* 19 *Barb.* 581; *S. C.* 25 *id.* 341.) The christian sabbath is then one of the civil institutions of the state, and to which

the business and duties of life are, by the common law, made to conform and adapt themselves. The same cannot be said of the Jewish sabbath, or the day observed by the followers of any other religion. The respect paid to such days, other than that voluntarily paid by those observing them as days of worship, is in obedience to positive law. There is no ground of complaint in the respect paid to the religious feeling of those who conscientiously observe the seventh rather than the first day of the week, as a day of rest, by the legislation upon that subject, and exempting them from certain public duties and from the service of process on their sabbath, and excepting them from the operation of certain other statutes regulating the observance of the first day of the week. (1 *R. S.* 675, § 70. *Laws of* 1847, *ch.* 349.) It is not an infringement of the right of conscience, or an interference with the free religious worship of others, that sabbatarians are exempted from the service of civil process and protected in the exercise of their religion on their sabbath. Still less is it a violation of the rights of conscience of any that the sabbath of the people, the day set apart by common consent and usage from the first settlement of the land as a day of rest, and recognized by the common law of the state as such, and expressly recognized in the constitution as an existing institution, should be respected by the law-making power, and provision made to prevent its desecration by interrupting the worship or interfering with the rights of conscience, in any way, of the public as a christian people. The existence of the sabbath day as a civil institution being conceded, as it must be, the right of the legislature to control and regulate it and its observance is a necessary sequence. If precedents were necessary to establish the right to legislate upon the subject, they could be cited from the statutes and ordinances of every government really or nominally christian, and from the earliest period. In England as early as the reign of Athelstan, all merchandising on the Lord's day was forbidden under severe penalties; and from that time very many stat-.

utes have been passed in different reigns regulating the keeping of the sabbath, prohibiting fairs and markets, the sale of goods, assemblies or concourse of the people for any sports and pastimes whatsoever, worldly labor, the opening of a house or room for public entertainment or amusement, the sale of beer, wine, spirits, &c. and other like acts on that day. There are other acts which are designed to compel attendance at church and religious worship, which would be prohibited by the constitution of this state as infringements upon the right to the free exercise and enjoyment of religious profession and worship. But the acts referred to do not relate to religious profession or worship, but to the civil obligations and duties of the subject. They have respect to his duties to the state, and not to God, and as such are within the proper limits of legislative power. There have been times in the history of the English government, when the day was greatly profaned, and practices tolerated at court and throughout the realm, on the sabbath and on other days, which would meet at this time with little public favor either there or here. But these exceptional instances do not detract from the force of the long series of acts of the British parliament, representing in legislation the sentiment of the British nation, as precedents and as a testimony in favor of the necessity and propriety of a legislative regulation of the sabbath. Our attention is called to the fact that James I. wrote a "Book of Sports," in which he declared that certain games and pastimes were lawful upon Sunday. The book was published in 1618, and by it he permitted the "lawful recreations" named, "after the end of divine service" on Sundays, "so as the same be had in due and convenient time, without impediment or neglect of divine service." The permission is thus qualified: "But withall we doe here account still as prohibited all unlawfull games to be used on Sundayes only, as beare and bull baitings, *interludes*, and at all times in the meaner sort of people prohibited, bowling." (*Baylee's Hist. Sabbath*,

157.)   Lindenmuller's theatre would have been prohibited even by King James' Book of Sports.

In most, if not all the states of the union, laws have been passed against sabbath-breaking, and prohibting the prosecution of secular pursuits upon that day ; and in none of the states, to my knowledge, except in California, have such laws been held by the courts to be repugnant to the free exercise of religious profession and worship, or a violation of the rights of conscience, or an excess or abuse of the legislative power, while in most states the legislation has been upheld by the courts and sustained by well-reasoned and able opinions.  (*Updegraph* v. *The Commonwealth*, 11 *S. & R.* 394. *Show* v. *State of Arkansas*, 5 *Eng.* (*Ark.*) 259.  *Bloom* v. *Richards*, 2 *Ohio R.* 387.  *Warne* v. *Smith*, 8 *Conn. R.* 14. *Johnston* v. *Com.* 10 *Harris*, 102.  *State* v. *Ambs*, 20 *Mis.* 214.  *Story* v. *Elliot*, 8 *Cowen*, 27.)

As the sabbath is older than our state government, was a part of the laws of the colony, and its observance regulated by colonial laws, state legislation upon the subject of its observance was almost coeval with the formation of the state government.   If there were any doubt about the meaning of the constitution securing freedom in religion, the contemporaneous and continued acts of the legislature under it would be very good evidence of the intent and understanding of its framers, and of the people who adopted it as their fundamental law.   As early as 1788, traveling, work, labor and exposing of goods to sale on that day were prohibited.   (2 *Greenl.* 89.)   In 1789 the sale of spirituous liquors was prohibited, (*Andrews*, 467 ;) and from that time statutes have been in force to prevent sabbath desecration, and prohibiting acts upon that day which would be lawful on other days of the week.   Early in the history of the state government, the objections taken to the act under consideration were taken before the council of revision, to an act to amend the act entitled "An act for suppressing immorality," which undertook to regulate sabbath observance, because the provisions as was

claimed militated against the constitution, by giving a pref-
erence to one class of christians and oppressing others; be-
cause it in some manner prescribed the mode of keeping the
sabbath; and because it was inexpedient to impose obliga-
tions on the conscience of men in matters of opinion. The
council, consisting of Governor Jay, Chief Justice Lansing,
and Judges Lewis and Benson, overruled the objections and
held them not well taken. (*Street's N. Y. Council of Rev.*
422.) I have not access to the California case referred to,
(*Ex parte Newman*, 9 *Cal.* 502,) but with all respect for the
court pronouncing the decision, as authority in this state, the
opinion of the council of revision thus constituted, and de-
liberately pronounced, should outweigh it. If the court in
California rest their decision upon a want of power in the
legislature to compel religious observances, I should not dis-
sent from the position, and the only question would be whether
the act did thus trench on the inviolable rights of the citizen.
If it merely restrained the people from secular pursuits and
from practices which the legislature deemed hurtful to the
morals and good order of society, it would not go beyond the
proper limits of legislation. The act complained of here
compels no religious observance, and offenses against it are
punishable not as sins against God, but as injurious to and
having a malignant influence on society. It rests upon the
same foundation as a multitude of other laws upon our stat-
ute book, such as those against gambling, lotteries, keeping
disorderly houses, polygamy, horse-racing, profane cursing
and swearing, disturbance of religious meetings, selling of
intoxicating liquor on election days within a given distance
of the polls, &c. All these and many others do to some ex-
tent restrain the citizen and deprive him of some of his nat-
ural rights; but the legislature have the right to prohibit
acts injurious to the public and subversive of the government,
or which tend to the destruction of the morals of the people
and disturb the peace and good order of society. It is ex-
clusively for the legislature to determine what acts should be

prohibited as dangerous to the community. The laws of every civilized state embrace a long list of offenses which are such merely as *mala prohibita,* as distinguished from those which are *mala in se.* If the argument in behalf of the plaintiff in error is sound, I see no way of saving the class of *mala prohibita.* Give every one his natural rights, or what are claimed as natural rights, and the list of civil offenses will be confined to those acts which are *mala in se,* and a man may go naked through the streets, establish houses of prostitution *ad libitum* and keep a faro-bank on every corner. This would be repugnant to every idea of a civilized government. It is the right of the citizen to be protected from offenses against decency, and against acts which tend to corrupt the morals and debase the moral sense of the community. Regarding the sabbath as a civil institution, well established, it is the right of the citizen that it should be kept and observed in a way not inconsistent with its purpose and the necessity out of which it grew, as a day of rest, rather than as a day of riot and disorder, which would be effectually to overthrow it, and render it a curse rather than a blessing.

Woodward, J. in *Johnston* v. *Com.* (10 *Harris,* 102,) says: " The right to rear a family with a becoming regard to the institutions of christianity, and without compelling them to witness the hourly infractions of one of its fundamental laws ; the right to enjoy the peace and good order of society, and the increased securities of life and property which result from a decent observance of the sabbath ; the right of the poor to rest from labor without diminution of wages ;" the right of beasts to the rest which nature calls for—are real, substantial rights, and as much the subject of governmental protection as any other right of person or property. But it is urged that it is the right of the citizen to regard the sabbath as a day of recreation and amusement, rather than as a day of rest and religious worship, and that he has a right to act upon that belief and engage in innocent amusements and recreations. This position it is not necessary to gainsay. But

who is to judge and decide what amusements and pastimes are innocent, as having no direct or indirect baneful influence upon community, as not in any way disturbing the peace and quiet of the public, as not unnecessarily interfering with the equally sacred rights of conscience of others ? May not the legislature, following the example of James I., which was cited to us as a precedent, declare what recreations are lawful, and what are not lawful as tending to a breach of the peace or a corruption of the morals of the people ? That is not innocent which may operate injuriously upon the morals of the old or young, which tends to interrupt the peaceable and quiet worship of the sabbath, and which grievously offends the moral sense of the community, and thus tends to a breach of the peace. It may well be that the legislature, in its wisdom, thought that a theater was eminently calculated to attract all classes, and the young especially, on a day when they were released from the confinement incident to the duties of the other days of the week, away from the house of worship and other places of proper rest, relaxation and instruction, and bring them under influence not tending to elevate their morals and to subject them to temptation to other vices entirely inconsistent with the safety of society. The gathering of a crowd on a Sunday at a theater, with its drinking saloons, and its usual, if not necessary, facilities for and inducements to licentiousness and other kindred vices, the legislature might well say was not consistent with the peace, good order and safety of the city. They might well be of the opinion that such a place would be "a nursury of vice, a school of preparation to qualify young men for the gallows and young women for the brothel." But whatever the reasons may have been, it was a matter within the legislative discretion and power, and their will must stand as the reason of the law.

We could not, if we would, review their discretion and sit in judgment upon the expediency of their acts. We cannot declare that innocent which they have adjudged baneful and

have prohibited as such.    The act in substance declares·a Sunday.theatre to be a nuisance, and deals with it as such. The constitution makes provision for this case by providing that the liberty of conscience secured by it "shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the state." The legislature have declared that Sunday theaters are of this character, and come within the description of acts and practices which are not protected by the constitution, and they are the sole judges.    The act is clearly constitutional, as dealing with and having respect to the sabbath as a civil and political institution, and not affecting to interfere with religious belief or worship, faith or practice.

It was conceded upon the argument that the legislature could entirely suppress theaters and prohibit theatrical exhibitions.    This, I think, yields the whole argument, for as the whole includes all its parts and the greater includes the lesser, the power of total suppression includes the power of regulation and partial suppression.    If they can determine what circumstances justify a total prohibition, they can determine under what circumstances the exhibitions may be innocuous, and under what circumstances and at what times they may be baneful, so as to justify a prohibition.

The other points made and argued are of less general importance, as they only affect this particular case, and notwithstanding they were ably and ingeniously argued, I have been unable to appreciate the views taken by the learned counsel for the plaintiff in error.

The law does not touch private property or impair its value. The possession and use of it, except for a single purpose and upon a given day, and the right to the possession and use, is as absolute to the plaintiff in error as it was the day before the passage of the law.    The restraint upon the use of the property is incidental to the exercise of a power vested in the legislature to legislate for the whole state.    The ownership and enjoyment of property cannot be absolute in

Lindenmuller *v.* The People.

the sense that incidentally the right may not be controlled or affected by public legislation. Public safety requires that powder magazines should not be kept in a populous neighborhood; public health requires that certain trades and manufactures should not be carried on in crowded localities; public interest requires that certain callings should be exercised by a limited number of persons and at a limited number of places; and legislative promotion of these objects necessarily qualifies the absolute ownership of property to the extent that it prohibits the use of it in the manner and for the purpose deemed inconsistent with the public good, but that deprives no man of his property or impairs its legal value. The fact that the plaintiff in error leased the property with a view to its occupancy for the purposes of a Sunday theater does not vary the question. He might have bought it for the same purpose, but that would by no means lessen the power of the legislature, or give him an indefeasible right to use it for the purpose intended, or to establish or perpetuate a public nuisance. The power of the legislature cannot thus be crippled or taken from them. As lessee he is *pro hac vice* the owner. He took his lease as every man takes any estate, subject to the right of the legislature to control the use of it so far as the public safety requires.

The contract with the performers, if one exists, for their services on the sabbath, stands upon the same footing, and is also subject to another answer, to wit, that the contract for sabbath work was void without the law of 1860. (*Smith v. Wilcox, Watts v. Van Ness, Palmer v. New York, supra.*) The sovereign power must, in many cases, prescribe the manner of exercising individual rights over property. The general good requires it, and to this extent the natural rights of individuals are surrendered. Every public regulation in a city does in some sense limit and restrict the absolute right of the individual owner of property. But this is not a legal injury. If compensation were wanted, it is found in the protection which the owner derives from the govern-

ment, and perhaps from some other restraint upon his neighbor in the use of his property. It is not a destruction or an appropriation of the property, and is not within any constitutional inhibition. (*Vanderbilt* v. *Adams*, 7 *Cowen*, 349. *People* v. *Walbridge*, 6 *id.* 512. *Mayor &c. of New York* v. *Miln*, 11 *Peters*, 102. 3 *Story's Const. Law*, 163.)

The conviction was right and the judgment must be affirmed.

[NEW YORK GENERAL TERM, February 4, 1861. *Clerke, Sutherland* and *Allen*, Justices.]