## SUPREME COURT.

GUSTAV LINDENMULLER, plaintiff in error agt. THE PEOPLE, defendants in error.

The *Christian religion* has always been engrafted upon our laws and entitled to protection as the basis of our morals and the strength of our government.

Therefore, every act done maliciously, tending to bring religion into contempt, may be punished at common law, and the *Christian Sabbath*, as one of the institutions of that religion, may be protected from desecration by such laws as the legislature may deem necessary to secure to the community the privilege of undisturbed worship, and to the day itself that outward respect and observance which may be deemed essential to the peace and good order of society.

The statute (April, 1860,) prohibiting certain exhibitions and plays on *Sunday, is not unconstitutional,* because, the legislature are the sole judges of the acts proper to be prohibited with a view to the public peace, and as obstructing religious worship, and bringing into contempt the religious institutions of the people.

Besides, the establishment and regulation of the Sabbath as a *civil and political* institution is within the just powers of the civil government; the right of the legislature, therefore, to control and regulate it, and its observance, not affecting to interfere with religious belief or worship, faith or practice, is a necessary sequence.

The *legislature* having declared substantially that *Sunday theatres* are a *nuisance,* and come within the description of acts and practices which are not protected by the constitution, the court could not, if it would, review their discretion and sit in judgment upon the expediency of their acts. (*This agrees with People agt. Hoym,* 20 *How.;* 76, *N. Y. Superior Court,* HOFFMAN, *Justice.*)

*New York General Term, May,* 1861.

*Present,* CLERKE, SUTHERLAND and ALLEN, *Justices.*

Lindenmuller agt. The People.

APPEAL from a judgment of conviction of the plaintiff in error.

F. S. STALKNECHT, H. L. CLINTON and J. T. BRADY, *for plaintiff in error.*
N. J. WATERBURY, *district attorney, and* J. H. ANTHON, *for defendants in error.*

By the court, ALLEN, Justice. The constitutionality of the law under which Lindenmuller was indicted and convicted does not depend upon the question whether or not christianity is a part of the common law of this state. Were that the only question involved it would not be difficult to show that it is so, in a qualified sense—not to the extent that would authorize a compulsory conformity in faith and practice to the creed and formula of worship of any sect or denomination, or even in those matters of doctrine and worship common to all denominations styling themselves christians, but to the extent that entitles the christian religion and its ordinances to respect and protection, as the acknowledged religion of the people. Individual consciences may not be enforced; but men of every opinion and creed may be restrained from acts which interfere with christian worship, and which tend to revile religion and bring it into contempt. The belief of no man can be constrained, and the proper expression of religious belief is guaranteed to all; but this right, like every other right, must be exercised with strict regard to the equal rights of others; and when religious belief or unbelief leads to acts which interfere with the religious worship, and rights of conscience of those who represent the religion of the country, as established, not by law, but by the consent and usage of the community, and existing before the organization of the government, their acts may be restrained by legislation, even if they are not indictable at common law. Christianity is not the legal religion of the state, as estab-

lished by law. If it were, it would be a civil or political institution, which it is not; but this is not inconsistent with the idea, that it is in fact, and ever has been, the religion of the people. This fact is everywhere prominent in all our civil and political history, and has been from the first, recognized and acted upon by the people as well as by constitutional conventions, by legislatures and by the courts of justice.

It is not disputed that christianity is a part of the common law of England; and in *Rex* agt. *Woolston*, (*Str.*, 834,) the court of King's Bench would not suffer it to be debated, whether to write against christianity in general was not an offence punishable in the temporal courts at common law. The common law, as it was in force on the 20th day of April, 1777, subject to such alterations as have been made, from time to time, by the legislature, except such parts of it as are repugnant to the constitution, is, and ever has been, a part of the law of the state. (*Const. of* 1846, *art.* 1, § 17; *Const. of* 1821, *art.* 7, § 13; *Const. of* 1777, § 25.) The claim is that the constitutional guarantees for the free exercise and enjoyment of religious profession and worship are inconsistent with and repugnant to the recognition of christianity, as the religion of the people entitled to and within the protection of the law. It would be strange that a people, christian in doctrine and worship, many of whom or whose forefathers had sought these shores for the privilege of worshiping God in simplicity and purity of faith, and who regarded religion as the basis of their civil liberty, and the foundation of their rights, should, in their zeal to secure to all the freedom of conscience which they valued so highly, solemnly repudiate and put beyond the pale of the law the religion which was dear to them as life, and dethrone the God who they openly and avowedly professed to believe, had been their protector and guide as a people. Unless they were hypocrites, which will hardly be charged, they would not have dared even if their consciences would

have suffered them to do so. Religious tolerance is entirely consistent with a recognized religion. Christianity may be conceded to be the established religion, to the qualified extent mentioned, while perfect civil and political equality with freedom of conscience and religious preference, is secured to individuals of every other creed and profession. To a very moderate and qualified extent, religious toleration was secured to the people of the colony, by the charter of liberties and privileges, granted by his Royal Highness to the inhabitants of New York and its dependencies in 1683, (2 *R. L., Appendix No.* 2,) but was more amply provided for in the constitution of 1777. It was then placed substantially upon the same footing on which it now stands. The constitution of 1777, § 38, ordained, that the free exercise and enjoyment of religious profession and worship, without discrimination or preference, should forever thereafter be allowed, provided that the liberty of conscience thereby guaranteed should not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of the state. The same provision was incorporated in the constitution of 1821, art. 7, § 3, and in that of 1846, art. 1, § 3. The convention that framed the constitution of 1777, ratified and approved the Declaration of Independence, and prefixed it to the constitution, as a part of the preamble, and in that instrument a direct and solemn appeal is made " to the Supreme Judge of the world," and a " firm reliance on the protection of Divine Providence" for the support of the declaration is deliberately professed. The people, in adopting the constitution of 1821, expressly acknowledged with " gratitude the grace and beneficence of God," in permitting them to make choice of their form of government; and in ratifying the constitution of 1846, declare themselves " grateful to Almighty God." for their freedom. The two first constitutions of the state, reciting that " ministers of the gospel are by their profession dedicated to the service of God and the cure of

souls, and ought not to be diverted from the great duties of their function," declare that no " minister of the gospel or priest of any denomination whatsoever should be eligible to or hold any civil or military office within the state," and each of the constitutions has required an oath of office from all except some of the inferior officers taking office under it.

These provisions and recitals very clearly recognize some of the fundamental principles of the christian religion, and are certainly very far from ignoring God as the supreme ruler and judge of the universe, and the christian religion as the religion of the people, embodying the common faith of the community, with its ministers and ordinances, existing without the aid of, or political connection with the state, but as intimately connected with a good government, and the only sure basis of sound morals.

The several constitutional conventions also recognized the christian religion as the religion of the state, by opening their daily sessions with prayer, by themselves observing the christian Sabbath, and by excepting that day from the time allowed to the governor for returning bills to the legislature.

Different denominations of christians are recognized, but this does not detract from the force of the recognition of God, as the only proper object of religious worship, and the christian religion as the religion of the people, which they did not intend to destroy, but to maintain. The intent was to prevent the unnatural connection between church and state, which had proved as corrupting and detrimental to the cause of pure religion as it had been oppressive to the conscience of the individual. The founders of the government and the framers of our constitutions believed that christianity would thrive better, that purity in the church would be promoted, and the interests of religion advanced, by leaving the individual conscience free and untrammelled, precisely in accordance with the " benevolent principles of rational liberty," which guarded against " spiritual

oppression and intolerance;" and "wisdom is justified of her children" in the experiment, which could hardly be said if blasphemy, Sabbath-breaking, incest, polygamy and the like were protected by the constitution. They did, therefore, prohibit the establishment of a state religion, with its enabling and disabling statutes, its test oaths and ecclesiastical courts, and all the pains and penalties of nonconformity, which are only snares to the conscience, and every man is left free to worship God according to the dictates of his own conscience, or not to worship Him at all, as he pleases. But they did not suppose they had abolished the Sabbath as a day of rest for all, and of christian worship for those who were disposed to engage in it, or deprived themselves of the power to protect their God from blasphemy and revilings, or their religious worship from unseemly interruptions. Compulsory worship of God in any form is prohibited, and every man's opinion on matters of religion, as in other matters, is beyond the reach of law. No man can be compelled to perform any act or omit any act as a duty to God; but this liberty of conscience in matters of faith and practice is entirely consistent with the existence, in fact, of the christian religion, entitled to and enjoying the protection of the law as the religion of the people of the state, and as furnishing the best sanctions of moral and social obligations. The public peace and public welfare are greatly dependent upon the protection of the religion of the country, and the preventing or punishing of offences against it, and acts wantonly committed subversive of it. The claim of the defence, carried to its necessary sequence, is, that the Bible and religion, with all its ordinances, including the Sabbath, are as effectually abolished as they were in France during the revolution, and so effectually abolished, that duties may not be enforced as duties to the state, because they have been heretofore associated with acts of religious worship or connected with religious duties. A provision similar to ours is found in the consti-

tution of Pennsylvania; and in *Vidal* agt. *Girard's Executors*, (2 *How.*, 127,) the question was discussed, whether the christian religion was a part of the common law of that state; and Justice STORY, in giving judgment, at page 198, after referring to the qualifications in the constitution, says: " So that we are compelled to admit, that although christianity be a part of the common law óf the state, yet it is so in this qualified sense, that its divine origin and truth are admitted, and therefore it is not to be maliciously and openly reviled and blasphemed against, to the annoyance of believers or the injury of the public." The same principle was decided by the state court, in *Updegraff* agt. *Commonwealth*, (11 *S. & R.*, 394.) The same is held in Arkansas, *Show* agt. *State*, (5 *Eng.*, 259.) In our own state, in *People* agt. *Ruggles*, (8 *J. R.*, 291,) the court held that blasphemy against God, and contumelious reproach and profane ridicule of Christ or the holy scriptures, were offences punishable at the common law in this state as public offences. Ch. KENT says that to revile the religion professed by almost the whole community is an abuse of the right of religious opinion and free discussion secured by the constitution, and that the constitution does not secure the same regard to the religion of Mahomet or of the Grand Llama as to that of our Savior, for the plain reason that we are a christian people, and the morality of the country is deeply ingrafted upon christianity. He says, further, that the constitution " will be fully satisfied by a free and universal toleration, without any of the tests, disabilities or discriminations incident to a religious establishment. To construe it as breaking down the common law barriers against licentious, wanton and impious attacks upon christianity itself, would be an enormous perversion of its meaning."

This decision gives a practical construction to the " toleration" clause in the state constitution, and limits its effect to a prohibition of a church establishment by the state, and

of all " discrimination or preference" among the several
sects and denominations in the " free exercise and enjoy-
ment of religious profession and worship." It does not, as
interpreted by this decision, prohibit the courts or the leg-
islature from regarding the christian religion as the religion
of the people, as distinguished from the false religions of
the world. This judicial interpretation has received the
sanction of the constitutional convention of 1821, and of
the people of the state in the ratification of that constitu-
tion, and again in adopting the constitution of 1846.

It was conceded in the convention of 1821, that the
decision in *People* agt. *Ruggles* did decide that the chris-
tian religion was the law of the land, in the sense that it
was preferred over all other religions, and entitled to the
recognition and protection of the temporal courts by the
common law of the state ; and the decision was commented
on with severity by those who regarded it as in violation
of the freedom of conscience and equality among religion-
ists secured by the constitution. Mr. Root proposed an
amendment to correct the alleged error of the supreme court
in that decision, made, as he considered, in defiance of the
constitution, to the effect that the judiciary should not
declare any particular religion to be the law of the land.
The decision was vindicated as a just exponent of the con-
stitution and the relation of the christion religion to the
state ; and the amendment was opposed by Chancellor
Kent, Daniel D. Tompkins, Col. Young, Mr. Van Buren,
Rufus King and Chief Justice Spencer, and rejected by a
large majority, and the former provision retained, with the
judicial construction fully recognized. (*N. Y. State Con-
vention of* 1821, 462, 574.) It is true that the gentlemen
differed in their views as to effect and extent of the decision,
and as to the legal status of the christian religion in the
state. One class, including Chief Justice Spencer and Mr.
King, regarded christianity—the christian religion as dis-
tinguished from Mahomedanism, &c.—as a part of the com-

mon law adopted by the constitution; while another class, in which were included Chancellor Kent and Mr. Van Buren, were of the opinion that the decision was right, not because christianity was established by law, but because christianity was in fact the religion of the country, the rule of our faith and practice, and the basis of public morals. According to their views, as the recognized religion of the country, "the duties and injunctions of the christian religion" were considered as interwoven with the law of the land, and as part and parcel of the common law, and that "maliciously to revile it is a public grievance, and as much so as any other public outrage upon common decency and decorum," (*Per Ch. Kent in debate, p.* 576.) This difference in views is in no sense material, as it leads to no difference in practical results and conclusions. All agreed that the christian religion was engrafted upon the law, and entitled to protection as the basis of our morals and the strength of our government, but for the reasons differing in terms and in words rather than in substance. Within the principle of the decision of *The People* agt. *Ruggles*, as thus interpreted and approved and made a part of the fundamental law of the land by the rejection of the proposed amendment, every act done maliciously, tending to bring religion into contempt, may be punished at common law, and the christian Sabbath, as one of the institutions of that religion, may be protected from desecration by such laws as the legislature, in their wisdom, may deem necessary to secure to the community the privilege of undisturbed worship, and to the day itself that outward respect and observance which may be deemed essential to the peace and good order of society, and to preserve religion and its ordinances from open reviling and contempt—and this not as a duty to God, but as a duty to society and to the state. Upon this ground the law in question could be sustained, for the legislature are sole judges of the acts proper to be prohibited, with a view to the public peace, and as obstructing religious worship,

and bringing into contempt the religious institutions of the people.

But as a civic and political institution, the establishment and regulation of a Sabbath is within the just powers of the civil government. With us, the Sabbath, as a civil institution, is older than our government. The framers of the first constitution found it in existence; they recognized it in their acts, and they did not abolish it, or alter it, or lessen its sanctions or the obligations of the people to observe it. But if this had not been so the civil government might have established it. It is a law of our nature that one day in seven should be observed as a time of relaxation and refreshment, if not for public worship. Experience has shown that the observance of one day in seven as a day of rest " is of admirable service to a state, considered merely as a civil institution." (4 *Bl. Com.*, 63.) We are so constituted, physically, that the precise portion of time indicated by the decalogue must be observed as a day of rest and relaxation, and nature, in the punishment inflicted for a violation of our physical laws, adds her sanction to the positive law promulgated at Sinai. The stability of government, the welfare of the subject and the interest of society have made it necessary that the day of rest observed by the people of a nation should be uniform, and that its observance should be to some extent compulsory, not by way of enforcing the conscience of those upon whom the law operates, but by way of protection to those who desire and are entitled to the day. The necessity and value of the Sabbath is acknowledged by those not professing christianity. In December, 1841, in the French Chamber of Deputies, an Israelite expressed his respect for the institution of the Lord's day, and opposed a change of law which would deprive a class of children of the benefit of it; and in 1844, the consistory general of the Israelites, at Paris, decided to transfer the Sabbath of the Jews to Sunday. A similar disposition was manifested in Germany. (*Bayler's*

*Hist. of Sab.*, 187.) As a civil institution, the selection of the day is at the option of the legislature; but for a christian people, it is highly fit and proper that the day observed should be that which is regarded as the christian Sabbath, and it does not detract from the moral or legal sanction of the law of the state that it conforms to the law of God, as that law is recognized by the great majority of the people. In this state the Sabbath exists as the day of rest by the common law, and without the necessity of legislative action to establish it; and all that the legislature attempt to do in the " Sabbath Laws" is to regulate its observance. The body of the constitution recognized Sunday as a day of rest, and an institution to be respected by not counting it as a part of the time allowed to the governor for examining bills submitted for his approval. A contract, the day of the performance of which falls on Sunday, must in the case of instruments on which days of grace are allowed, be performed on the Saturday preceding, and in all other cases on Monday. (*Salter* agt. *Burt*, 20 *T. R.*, 205; *Avery* agt. *Stewart*, 2 *Cow.*, 69.) Compulsory performance on the Sabbath cannot be required, but the law prescribes a substituted day. Redemption of land, the last day for which falls on Sunday, must be made the day before. (*People* agt. *Luther*, 1 *W. R.*, 42.) No judicial act can be performed on the Sabbath, except as allowed by statute, while ministerial acts not prohibited are not illegal. (*Sayles* agt. *Smith*, 12 *W. R.*, 57; *Butler* agt. *Kelsey*, 15 *J. R.*, 177; *Field* agt. *Park*, 20 *id.*, 140.) Work done on a Sunday cannot be recovered for, there being no pretence that the parties keep the last day of the week, the work not being a work of necessity and charity. (*Watts* agt. *Van Ness*, 1 *Hill*, 76; *Palmer* agt. *City of New York*, 2 *Sand.*, 318; *Smith* agt. *Wilcox*, 19 *Barb.*, 581; *S. C.*, 25 *id.*, 341.) The christian Sabbath is then one of the civil institutions of the state, and to which the business and duties of life are, by the common law, made to conform and adapt themselves. The

same cannot be said of the Jewish Sabbath, or the day observed by the followers of any other religion. The respect paid to such days, other than that voluntarily paid by those observing them as days of worship, is in obedience to positive law. There is no ground of complaint in the respect paid to the religious feeling of those who conscientiously observe the seventh rather than the first day of the week, as a day of rest, by the legislation upon that subject, and exempting them from certain public duties and from the service of process on their Sabbath, and excepting them from the operation of certain other statutes regulating the observance of the first day of the week. (1 *R. S.*, 675, §70, *Laws of* 1847, *ch.* 349.) It is not an infringement of the right of conscience or an interference with the free religious worship of others, that sabbatarians are exempted from the service of civil process and protected in the exercise of their religion on their Sabbath. Still less is it a violation of the rights of conscience of any that the Sabbath of the people, the day set apart by common consent and usuage from the first settlement of the land, as a day of rest, and recognized by the common law of the state as such, and expressly recognized in the constitution as an existing institution, should be respected by the law-making power, and provision made to prevent its desecration by interrupting the worship or interfering with the rights of conscience, in any way, of the public as a christian people. The existence of the Sabbath day as a civil institution being conceded, as it must be, the right of the legislature to control and regulate it and its observance is a necessary sequence. If precedents were necessary to establish the right to legislate upon the subject, they could be cited from the statutes and ordinances of every government really or nominally christian, and from the earliest periods. In England as early as the reign of Athelstan, all merchandizing on the Lord's day was forbid under severe penalties; and from that time very many statutes have been

passed in different reigns regulating the keeping of the Sabbath, prohibiting fairs and markets, the sale of goods, assemblies or concourse of the people for any sports and pastimes whatsoever, worldly labor, the opening of a house or room for public entertainment or amusement, the sale of beer, wine, spirits, &c., and other like acts on that day. There are other acts which are designed to compel attendance at church and religious worship, which would be prohibited by the constitution of this state as infringements upon the right to the free exercise and enjoyment of religious profession and worship. But the acts referred to, do not relate to religious profession or worship, but to the civil obligations and duties of the subject. They have respect to his duties to the state, and not to God, and as such are within the proper limits of legislative power. There have been times in the history of the English government, when the day was greatly profaned, and practices tolerated at court and throughout the realm, on the Sabbath and on other days, which would meet at this time with little public favor either there or here. But these exceptional instances do not detract from the force of the long series of acts of the British Parliament, representing in legislature the sentiment of the British nation, as precedents and as a testimony in favor of the necessity and propriety of a legislative regulation of the Sabbath. Our attention is called to the fact that James I. wrote a " Book of Sports," in which he declared that certain games and pastimes were lawful upon Sunday. The book was published in 1618, and by it he permitted the " lawful recreations" named " after the end of Divine service" on Sundays, " so as the same be had in due and convenient time, without impediment or neglect of Divine service." The permission is thus qualified : " But withall we do here account still as prohibited all unlawfull games to be used on Sundayes only, as beare and bull baitings, *interludes,* and at all times in the meaner sort of people prohibited, bowling." (*Bayler's*

*Hist. Sabbath*, 157.) Lindenmuller's theatre would have been prohibited even by King James's Book of Sports.

In most, if not all the states of the Union, laws have been passed against Sabbath breaking, and prohibiting the prosecution of secular pursuits upon that day; and in none of the States, to my knowledge, except in California, have such laws been held by the courts to be repugnant to the free exercise of religious profession and worship, or a violation of the rights of conscience or an excess or abuse of the legislative power, while in most states the legislature has been upheld by the courts and sustained by well-reasoned and able opinions. (*Updegraph* agt. *Commonwealth*, 11 *S. & R.*, 394; *Arkansas, Snow* agt. *State*, 5 *Eng.*, 259; *Bloom* agt. *Richards*, 2 *Ohio*, 387; *Warne* agt. *Smith*, 8 *Conn.*, 14; *Johnston* agt. *Cunn*, 10 *Har.*, 102; *State* agt. *Arabs*, 20 *Miss.*, 214; *Story* agt. *Elliott*, 8 *Cow.*, 27.)

As the Sabbath is older than our state government, was a part of the laws of the colony, and its observance regulated by colonial laws, state legislation upon the subject of its observance was almost coeval with the formation of the state government. If there were any doubt about the meaning of the constitution securing freedom in religion, the contemporaneous and continued acts of the legislature under it would be very good evidence of the intent and understanding of its framers, and of the people who adopted it as their fundamental law. As early as 1788, travelling, work, labor and exposing of goods to sale on that day were prohibited. (2 *Greenl.*, 89.) In 1789, the sale of spirituous liquors was prohibited, (*Andrews*, 467;) and from that time, statutes have been in force to prevent Sabbath desecration, and prohibiting acts upon that day which would be lawful on other days of the week. Early in the history of the state government, the objections taken to the act under consideration were taken before the Council of Revision, to an act to amend the act entitled " an act for suppressing immorality," which undertook to regulate Sabbath obser-

vance, because the provisions as was claimed militated against the constitution by giving a preference to one class of christians and oppressing others, because it in some manner prescribed the mode of keeping the Sabbath, and because it was inexpedient to impose obligations on the consciences of men in matters of opinion.   The council, consisting of Governor Jay, Chief Justice Lansing, and Judges Lewis and Benson, overruled the objections and held them not well taken.   (*Street's N. Y. Council of Revision*, 422.)   I have not access to the California case referred to, (*ex parte Newman*, 9 *Cal.*, 502,) but with all respect for the court pronouncing the decision, as authority in this state, the opinion of the *Council of Revision* thus constituted, and deliberately pronounced, should outweigh it.   If the court in California rests their decision upon a want of power in the legislature to compel religious observances, I should not dissent from the position, and the only question would be whether the act did thus trench on the inviolable rights of the citizen. If it merely restrained the people from secular pursuits and from practices which the legislature deemed hurtful to the morals and good order of society, it would not go beyond the proper limits of legislation.   The act complained of here compels no religious observance, and offences against it are punishable not as sins against God, but as injurious to and having a malignant influence on society.   It rests upon the same foundation as a multitude of other laws upon our statute book, such as those against gambling, lotteries, keeping disorderly houses, polygamy, horse-racing, profane cursing and swearing, disturbance of religious meetings, selling of intoxicating liquor on election days within a given distance of the polls, &c.   All these and many others do to some extent restrain the citizen and deprive him of some of his natural rights; but the legislature have the right to prohibit acts injurious to the public and subversive of the government, which tend to the destruction of the morals of the people and disturb the peace and good order of

society.   It is exclusively for the legislature to determine what acts should be prohibited as dangerous to the community.   The laws of every civilized state embrace a long list of offences which are such merely as *mala prohibita*, as distinguished from those which are *mala in se*.   If the argument in behalf of the plaintiff in error is sound, I see no way of saving the class of *mala prohibita*.   Give every one his natural rights, or what are claimed as natural rights, and the list of civil offences will be confined to those acts which are *mala in se*, and a man may go naked through the streets, establish houses of prostitution *ad libitum*, and keep a faro-table on every corner.   This would be repugnant to every idea of a civilized government.   It is the right of the citizen to be protected from offences against decency, and against acts which tend to corrupt the morals and debase the moral sense of the community.   Regarding the Sabbath as a civil institution, well established, it is the right of the citizen that it should be kept and observed in a way not inconsistent with its purpose and the necessity out of which it grew, as a day of rest rather than as a day of riot and disorder, which would be effectually to overthrow it, and render it a curse rather than a blessing.

WOODWARD, J., in *Johnston* agt. *Cunn*, (10 *Har.*, 102,) says : "The right to rear a family with a becoming regard to the institutions of christianity, and without compelling them to witness the hourly infractions of one of its fundamental laws ; the right to enjoy the peace and good order of society and the increased securities of life and property which result from a decent observance of the Sabbath ; the right of the poor to rest from labor without diminution of wages ; the right of beasts to the rest which nature calls for—are real, substantial rights, and as much the subject of governmental protection as any other right of person or property. But it is urged that it is the right of the citizen to regard the Sabbath as a day of recreation, and amusement, rather than as a day of rest and religious worship, and that he

has a right to act upon that belief and engage in innocent amusements and recreations.    This position it is not necessary to gainsay.    But who is to judge and decide what amusements and pastimes are innocent, as having no direct or indirect baneful influence upon community, as not in any way disturbing the peace and quiet of the public, as not unnecessarily interfering with the equally sacred rights of conscience of others?    May not the legislature, following the example of James I., which was cited to us as a precedent, declare what recreations are lawful, and what are not lawful as tending to a breach of the peace or a corruption of the morals of the people?    That is not innocent which may operate injuriously upon the morals of the old or young, which tends to interrupt the peaceful and quiet worship ot the Sabbath, and which grievously offends the moral sense of the community, and thus tends to a breach of the peace.    It may well be that the legislature, in its wisdom, thought that a threatre was eminently calculated to attract all classes, and the young especially, on a day when they were released from the confinement incident to the duties of the other days of the week, away from the house of worship and other places of proper rest, relaxation and instruction, and bring them under influences not tending to elevate their morals and to subject them to temptation to other vices entirely inconsistent with the safety of society.    The gathering of a crowd on a Sunday at a theatre, with its drinking saloons, and its usual, if not necessary, facilities for and inducements to licentiousness and other kindred vices, the legislature might well say was not consistent with the peace, good order and safety of the city. They might well be of the opinion that such a place would be " a nursery of vice, a school of preparation to qualify young men for the gallows and yonng women for the brothel."    But whatever the reasons may have been, it was a matter within the legislative discretion and power, and their will must stand as the reason of the law.

We could not if we would review their discretion and sit in judgment upon the expediency of their acts. We cannot declare that innocent which they have adjudged baneful and have prohibited as such. The act in substance declares a Sunday theatre to be a nuisance, and deals with it as such. The constitution makes provision for this case by providing that the liberty of conscience secured by it "shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state." The legislature have declared that Sunday theatres are of this character, and come within the description of acts and practices which are not protected by the constitution, and they are the sole judges. The act is clearly constitutional, as dealing with and having respect to the Sabbath as a civil and political institution, and not affecting to interfere with religious belief or worship, faith or practice.

It was conceded upon the argument that the legislature could entirely suppress theatres and prohibit theatrical exhibitions. This, I think, yields the whole argument, for as the whole includes all its parts and the greater includes the lesser, the power of total suppression includes the power of regulation and partial suppression. If they can determine what circumstances justify a total prohibition, they can determine under what circumstances the exhibitions may be innocuous, and under what circumstances and at what times they may be baneful, so as to justify prohibition.

The other points made and argued are of less general importance, as they only affect this particular case, and notwithstanding, they were ably and ingeniously urged, I have been unable to appreciate the views taken by the learned counsel for the plaintiff in error.

The law does not touch private property or impair its value. The possession and use of it, except for a single purpose and upon a given day, and the right to the possession and use, is as absolute to the plaintiff in error as it was

the day before the passage of the law.    The restraint upon
the use of the property is incidental to. the exercise of a
power vested in the legislature to legislate for the whole
state.    The ownership and enjoyment of property cannot
be absolute in the sense that incidentally the right may not
be controlled or affected by public legislation.    Public
safety requires that powder-magazines should not be kept
in a populous neighborhood; public health requires that
certain trades and manufactures should not be carried on
in crowded localities; public interest requires that certain
callings should be exercised by a limited number of persons
and at a limited number of places; and legislative prohibi-
tion of these objects necessarily qualifies the absolute own-
ership of property to the extent that it prohibits the use
of it in the manner and for the purpose deemed inconsistent
with the public good, but that deprives no man of his pro-
perty or impairs its legal value.    The fact that the plaintiff
in error leased the property with a view to its occupancy
for the purposes of a Sunday theatre does not vary the
question.    He might have bought it for the same purpose,
but that would by no means lessen the power of the legis-
lature, or give him indefeasible right to use it for the pur-
pose intended, or to establish or perpetuate a public nui-
sance.    The power of the legislature cannot thus be crippled
or taken from them.    As lessee he is *pro hac vice* the owner.
He took his lease as every man takes any estate, subject to
the right of the legislature to control the use of it so far as
the public safety requires.

The contract with the performers, if one exists, for these
services on the Sabbath, stands upon the same footing, and
is also subject to another answer, to wit, that the contract
for Sabbath work was void without the law of 1860. (*Smith*
agt. *Wilcox*; *Watts* agt. *Van Ness*; *Palmer* agt. *New York*,
*supra*.)    The sovereign power must, in many cases, pre-
scribe the manner of exercising individual rights over pro-
perty.    The general good requires it, and to this extent the

natural rights of individuals are surrendered. Every public regulation in a city does in some sense limit and restrict the absolute right of the individual owner of property. But this is not a legal injury. If compensation were wanted, it is found in the protection which the owner derives from the government, and perhaps from some other restraint upon his neighbor in the use of his property. It is not a destruction or an appropriation of the property, and is not within any constitutional inhibition. (*Vanderbilt* agt. *Adams*, 7 *Cow.*, 349; *People* agt. *Walbridge*, 6 *id.*, 512; *Mayor, &c., of New York* agt. *Miln*, 11 *Peters*, 102; 3 *Story's Const. Law*, 163.)

The conviction was right and the judgment must be affirmed.