# CITY MAGISTRATE'S COURT — BOROUGH OF THE BRONX — SIXTH DISTRICT.

## February, 1918.

## THE PEOPLE v. B. J. KAHN.

SUNDAY PERFORMANCES—PENAL LAW, § 2152—OWNERSHIP OF THEATRE.

The naked fact of ownership of a theatre or other place of amusement is insufficient to base thereon a violation of Penal Law, § 2152, relating to Sunday performances. Only such an owner is liable as leases or assents to the use of the theatre for the prohibited purposes.

SAME—OWNER'S NAME ON TICKET.

The appearance of the owner's name on the admission ticket as part of the title of the theatre does not of itself justify the presumption that he has assented to a prohibited performance.

SAME—"NEGRO" DANCING.

In the phrase "negro or other dancing" used in section 2152 of the Penal Law the words "or other dancing" are to be construed ejusdem generis to signify the type of dancing of the American negro classed in 1860 as "negro" dancing.

SAME—"SERIOUS INTERRUPTION."

Quære: Whether under section 2140 of the Penal Law, prohibiting acts which are "serious interruptions of the repose and religious liberty of the community," performance of the prohibited acts is per se a violation of law, or in order to constitute a violation there must be established a "serious interruption" as matter of fact.

*Francis Martin*, District Attorney, and *Herman T. Fliederblum*, Assistant District Attorney, for the People.

*Maurice Goodman* and *Philip M. Stern*, for the defendant.

GROSSMAN, Magistrate:

The defendant is charged with a violation of section 2152 of the Penal Law, which provides as follows:

See Note on Sunday Laws, *ante*, p. 119; also Vol. 18, p. 407; Vol. 22, p. 43.

"The performance of any tragedy, comedy, opera, ballet, farce, negro minstrelsy, negro or other dancing, wrestling, boxing with or without gloves, sparring contest, trial of strength, or any part or parts therein, or any circus, equestrian or dramatic performance or exercise, or any performance or exercise of jugglers, acrobats, club performances or rope dancers on the first day of the week is forbidden; and every person aiding in such exhibition, performance or exercise by advertisement, posting or otherwise, and every owner or lessee of any garden, building or other room, place, or structure, who leases or lets the same for the purpose of any such exhibition, performance or exercise, or who assents to the use of the same, for any such purpose, if it be so used, is guilty of a misdemeanor."

The specific offense charged is that on Sunday night, January 13, 1918, there were performed upon the stage of the defendant's theatre, the Follies Theatre, at One Hundred and Fiftieth street and Melrose avenue, performances of five certain theatrical acts. The first was that of two negroes and a piano player. The next was a female singer. Then came two men and a woman in what is commonly called a sketch. Then followed an exhibition of one releasing himself from a straitjacket and also from handcuffs. Lastly came an act entitled "Princess Matella and Company," the company consisting of three men and a woman. The princess appeared to be a Hawaiian. With the assistance of the "company," she gave what purported to be a Hawaiian dance, more or less in rhythm with the music.

While there is evidence that the defendant is the owner of the theatre, it is quite meagre, and rests principally upon an alleged admission on his part. At the close of the People's case a motion was made to dismiss the complaint. For the purposes of this motion I must hold that the ownership of the defendant was established *prima facie*.

It will be observed, however, that section 2152 does not make the naked fact of ownership of the theatre sufficient to predicate

thereon the commission of the offense charged. Only such owner is thereby made liable " who leases or lets the same for the purpose of any such (prohibited) exhibition, performance or exercise, or who assents to the use of the same for any such purpose if it be so used." Defendant's admission of ownership, coupled with the fact that the defendant's name appears upon the ticket of admission, given in his absence by a person other than himself, is not sufficient proof either of such leasing or letting, nor of his assent to the prohibited use.

Furthermore, from the style in which the defendant's name appears on the admission ticket, "B. F. Kahn's Follies Theatre," his connection with the performance cannot be presumed. The name of a person is not infrequently used as a mere trade name or as the title of a theatre. Thus, Booth's Theatre, B. F. Keith's Alhambra and Harry C. Miner's Theatre furnish well-known illustrations of such use of persons' names dissociated from actual ownership or management.

A violation of section 2152 is not only punishable as a misdemeanor, but in addition to the punishment therefor provided by statute a penalty of $500 may be recovered; and, besides, every exhibition, performance or exercise thereby prohibited of itself annuls the license of the theatre. Where such drastic pains and penalties are entailed by the violation of a statute the defendant is entitled to have strict proof made against him of every element constituting his alleged offense.

In the case at bar the evidence falls short in this respect. Not only does it fail in the requirement already pointed out, but the acts themselves do not come within the inhibition of section 2152. Reference to the origin of section 2152, as well as to the language employed therein, makes this clear.

The provisions of the Revised Statutes, which had been incorporated from the Colonial Laws into chapter 42 of the Laws of 1788, and thence into the Revised Laws of 1813 (2d Van Ness & Woodworth Revised Laws, p. 193) and the Revised Statutes

of 1828 (1st Rev. Stat., 1st ed., part 1, chap. 20, title 8, p. 675), contained the following provisions, applicable to the entire State:

" Sec. 70.   There shall be no shooting, hunting, fishing, sporting, playing, horse racing, gaming, frequenting of tippling houses, or any unlawful exercise or pastimes on the first day of the week called Sunday; nor shall any person travel on that day unless in cases of charity and necessity, unless done by some person who uniformly keeps the last day of the week called Saturday as holy time, and does not labor or work on that day, and whose labor shall not disturb other persons in their observance of the first day of the week as holy time.

" Sec. 71.   No person shall expose to sale any wares, merchandise, fruits, herbs, goods or chattels on Sunday, except," &c.

Chapter 501 of the Laws of 1860, which had reference only to the city of New York, provided: " Section 1.   It shall not be lawful to exhibit on the first day of the week, commonly called Sunday, to the public in any building, garden, grounds, concert room, or other room or place within the City and County of New York, any interlude, tragedy, comedy, opera, ballet, play, farce, negro minstrelsy, negro or other dancing, or any other entertainment of the stage, or any part or parts therein, or any equestrian, circus or dramatic performance, or any performance of jugglers, acrobats or rope dancing."

The provisions of the Law of 1860 were thereafter carried into section 2007 of the Consolidation Act, and thence into section 1481 of the Greater New York Charter, and were in 1881, with some modifications, made part of the Penal Code under a chapter which was denominated " Of Crimes Against Religious Liberty and Conscience."   Section 259 of that chapter provided: " The Sabbath: The first day of the week being by general consent set apart for rest and religious uses, the law prohibits the doing on that day of certain acts hereinafter specified which are serious interruptions of the repose and religious liberty of the community."

Then followed section 260, which made a violation of section 259 the crime of " Sabbath breaking "; sections 261 and 262, which have been repealed; section 263, which prohibited all labor, excepting works of necessity or charity; section 264, which permitted labor by persons who observe another day as Sabbath; section 265, which prohibited public sports; section 266, which prohibited trades, &c.; section 267, which prohibited public traffic; section 268, which prohibited all serving of processes; section 269, which made Sabbath breaking a misdemeanor and fixed the punishment therefor; sections 270, 271, 272, 273, 274 and 275, which had no bearing on the question under review; section 276, which prohibited processions and parades; and finally section 277, which prohibited certain theatrical performances. These sections have now been re-enacted in substance in the Penal Law.

Section 2152 of the Penal Law is derived from section 277 of the former Penal Code.

From a reading of section 2152 it will be observed that the prohibitions contained in chapter 501 of the Laws of 1860 have been materially lessened. The word " interlude," equivalent to what is now known as " playlet " or " sketch," and the sweeping and comprehensive words, " or any other entertainment of the stage or any part or parts therein," contained in chapter 501 of the Laws of 1860, are omitted from section 2152, and in place thereof the prohibition by express words of feats of strength, such as " wrestling, boxing with or without gloves, sparring contest, trial of strength, or any part or parts therein," and " club performances " and acts of " exercise " is added.

The " playlet " or " sketch " and a variety of other performances, such as singing, playing of musical instruments, mimicry, monologues, duologues, illusionists, ventriloquists and innumerable other acts fall outside of any classification contained in the statute. There can be no question as to any of the acts here complained of, with the possible exception of Princess Matella

and Company, for none of the other acts are specifically men-
tioned in the statute.    The performance of Princess Matella and
Company is the only act as to which any contention might arise.
Section 2152, it will be observed, in relation to dancing, pro-
hibits only " ballet," " negro or other dancing," and " rope "
dancers.    Were it the legislative intent to prohibit all forms,
styles and classes of dancing upon the stage on Sunday, it would
have been easy to have enacted it in the statute in so many
words.    The statute, in express terms, either could have pro-
hibited " dancing " or (besides ballet) " negro *and* all other
dancing."    Failing this, it is clear that the prohibition of all
dancing was not intended.    Indeed, it would be difficult to
credit the Legislature with so extreme an intention.

The history of the terpsichorean art and the status of stage
dancing at the time of the enactment of the original statute
fortifies the view that the words " or other dancing " merely
serve to particularize " negro dancing " as distinguished from
" ballet," and that the words " *or* other dancing " are to be con-
strued *ejusdem generis*.    By this canon of construction general
words following the enumeration of particular classes of things
will be considered as applicable only to things of the same gen-
eral nature or class as those enumerated.    Indeed, the words
" negro dancing " are not properly descriptive of the dance in-
tended to be prohibited.    By " negro dancing " used in the
statute was not intended the wild, primitive dances of the native
negroes of Africa, for such dancers formed no part of our stage
entertainment.

The words " negro dancing " used in the statute were supple-
mented by the words " *or* other dancing," and the probable in-
tent of these terms was as an alternative phrase to typify and
limit the type of dancing prohibited to the dancing of the
American negro, classed in 1860 as " negro dancing," and to
dancing of the same type.    Such " negro " dances then popu-
larly practiced upon the stage and in street exhibitions and

performances of strolling players were dances of noisy, rude and violent character.

The origin and history of dancing demonstrates that many other forms of dancing were not only permitted on the Sabbath but frequently formed part of religious ceremonies. As pointed out by Daniel Frohman in his learned and well-written article in Encyclopedia Americana (Vol. 5), dancing formed a prominent part of the worship of antiquity. At Rome a very ancient order of priests struck their shields and in religious worship sang as they danced. The practice reappeared in the early church, where special provision was made for dancing in the choir. "Among the ancient Jews," says Frohman, "Miriam danced to a song of timbrels (Exodus, xv, 20), itself an act of worship, and David danced in procession before the Ark of God (II Samuel, vi, 5, 14, 15). Religious processions went with song and dance to the temples. The Cretan chorus, moving in measured pace, sang hymns to the Greek god Apollo, and one of the muses (Terpsichore) was the special patroness of the art." It is worthy of note that even in the earliest days, when the still Sabbath in its most rigid form of observance prevailed, dancing was permissible, being regarded as a natural expression of joy. When, as will be hereafter shown, under Puritan influence, attempts were made to bring about too strict an observance of Sunday, Charles I, to counteract this, republished an injunction issued by his father, James I, in which he declared: "As for our good people's lawful recreation, our pleasure is that after the end of the divine service our good people be not letted or discouraged from any lawful pleasures, such as dancing, either men or women, archery for men, leaping, vaulting or any other such harmless recreation, or from having Maypoles, Whitsonales, morris dances," and so forth.

Dancing in our day as a form of entertainment and amusement, both of the stage and elsewhere, has attained an unprecedented popularity. It is expressive of gracefulness, beauty

and art, and in the classic and interpretative dancing of such artists as Pavlowa, Maud Allan, Isadora Duncan, Roshanara and others may be said to have been realized the poetry of motion. With this history of the dance, its harmless and in part sacred origin, its toleration and indulgence on the Sabbath among the strictest sectarians, it is against reason to assume that it was the legislative intent to ally all dances with the then current form of dancing known as " negro dancing " and in one fell swoop ban them all under the phrase used in the statute, " or other dancing." As already stated, this phrase can only properly be construed *ejusdem generis* with the words " negro dancing " or as adjectivial to the word " negro," to characterize the particular type of negro dancing then in vogue.

The legislative intent was clearly expressed by its enactment of the Greater New York Charter.

Title 2 of chapter 22 of the charter is entitled "Amusements." Section 1472 thereof specified that the following public exhibitions must be licensed, namely : " Interlude, tragedy, comedy, opera, ballet, play, farce, *minstrelsy or dancing* or any part or parts therein, or any equestrian, circus or dramatic performance, or any performance of jugglers or rope dancing or acrobats."

By section 1481 of the same title (now transferred to section 2152, Penal Law) all the exhibitions above mentioned were prohibited on Sunday, except that in the prohibitions " minstrelsy " is limited to " negro minstrelsy," and " dancing " is limited to " negro or other dancing."

It is quite clear, therefore, that as the Legislature used the generic word " dancing " in the licensing section, if it had intended to prohibit *all* dancing on Sunday it would have used the same generic words in said sections 1481 and 2152.

A broader question may now be considered. That is, whether dancing (even were it — as clearly it is not — within the inhibition of the statute) is *per se* violative of the law against Sabbath breaking. When we have regard to the cause and

origin of article 192 (against Sabbath breaking), of which section 2152 is a part, and take in connection therewith the rise and progress of the stage, its importance and value as an educational, moral and elevating force, helpful of the good order and comfort of the community, it may well be questioned whether an act which does not *in fact* " seriously interrupt the repose and religious liberty of the community " is interdicted. In early days of the drama, when theatrical performances were conducted in rude structures or upon open grounds, there was readily occasioned the gathering of indiscriminate, uncontrollable and turbulent mobs of people to whom acts profaning and desecrating the Sabbath would appeal for entertainment. Showmen and players were in large part mere strollers, owing no local friendships or allegiance, hence careless of their own standing. Theatres and their appointments were then of primitive and temporary character, involving little financial outlay (see Brackett's " Law of the Theatre," par. 10, 16, 21; Wandell's " Law of the Theatre," pp. 3-11; Taine's " History of English Literature," Vol. 1, p. 264). Those were the days of statutes such as 39 Eliz., cap. 141, Jac., cap. 7, which enacted that " all bear wards, common players of interludes, counterfeit Egyptians, &c., shall be taken, adjudged and deemed rogues, vagabonds and sturdy beggars, and shall sustain all pains and punishment as by this act is in that behalf appointed," or such as 12 Queen Anne, which rendered such malefactors, including also minstrels, jugglers, &c., liable to be " openly whipped until his or her body be bloody," or " sent to the house of correction, there to be kept at hard labor."

In modern times, however, the theatre, patronized and supported by our best citizenry, controlled by men of excellent moral and financial standing, operated in a civilizing, inspiring and enlightened spirit, housed in permanent and costly structures, licensed, regulated and built according to statute, is conducted with a design to insure quiet and good order and to

prevent interference by noise or impropriety with the well-being, repose and religious liberty of the community. A charge involving the forfeiture of the theatre's license is neither to be lightly regarded nor casually disposed of.

It is of the utmost importance that the sanctity and repose of the Sabbath be preserved and upheld. The Legislature has the authority to protect the Christian Sabbath from desecration by such laws as it may deem necessary, and it is the sole judge of the acts proper to be prohibited with a view to the public peace of that day. (People v. Havnor [1896], 149 N. Y. 196; Neuendorff v. Duryea [1877], 69 N. Y. 557; affg. 6 Daly, 276; Lindenmuller v. People, 33 Barb. 548, 21 How. Pr. 156; People v. Ball, 42 Barb. 325; People v. Hoym, 20 How. Pr. 76; Matter of City of N. Y. [1907], 57 Misc. 55. See, also, Cooley Const. Lim., 5th ed., 589; 18 Am. L. Rev. 778; 33 Alb. L. J. 194; Crim. L. Mag. 735, 961.) The Christian Sabbath is one of the civil institutions of the State, and that the Legislature, for the purpose of promoting the moral and physical well-being of the people and the peace, quiet and good order of society, has authority to regulate its observance and prevent its desecration by any appropriate legislation is unquestioned. (People v. Moses, 140 N. Y. 214, 215.) "With us the Sabbath, as a civil institution, is older than the government. The framers of the first Constitution found it in existence; they recognized it in their acts, and they did not abolish it or alter it or lessen its sanctions or the obligations of the people to observe it. * * * In this State the Sabbath exists as a day of rest by the common law, and without the necessity of legislative action to establish it, and all that the Legislature attempts to do in the 'Sabbath Laws' is to regulate its observance." (Lindenmuller v. People, 33 Barb. 568, 569, 21 How. Pr. 156.)

These fundamental and important principles are undoubted. Grave question, however, has arisen upon the practical construction to be placed upon the statutes under examination. Whether

the language of section 2140, making reference to "serious interruptions of the repose and religious liberty of the community" is definitive of the acts enumerated in the subsequent sections of article 192 as prohibited acts and declares them *per se* acts of Sabbath breaking, or whether the Legislature, mindful of the rights and privileges of the entire community, by use of these words places a limitation upon the criminal character of such acts and declares them only then to be violative of the statute when they are established as being *in fact* " serious interruptions of the repose and religious liberty of the community," has never been authoritatively decided by our court of last resort. In the early case of People v. Moses (140 N. Y. 214) three judges of our Court of Appeals held that in order to constitute a violation of the statute any such act need not *in fact* be a " serious interruption of the repose and religious liberty of the community," while three other judges of that court dissented from this view, and the remaining judge held that the specific act in the case there under consideration was *in fact* committed under such circumstances as to constitute such " serious interruption." The highest court being thus evenly divided, the question remains an open one, whose true solution can best be reached by a retrospect upon the Sabbatarian laws in the light of our modern attitude toward the stage.

When the church was made a department of the State by the Christian emperors of Rome the observance of Sunday was enforced by civil statute. When the Roman Empire passed away and the office of *pontifex maximus,* once held by the Emperor of Rome, was claimed by the Bishop of Rome, Sunday observance was enforced by ecclesiastical as well as civil law. The third Council of Orleans in 538 A. D. forbade all rural work on Sunday. Pope Gregory I made at Rome the same law as had been passed in 578 A. D. by the Council of Auxerre: " On the Lord's Day it is not permitted to yoke oxen or to perform any other work, excepting for approved reasons." Charlemagne

23

in 813 A. D. enacted that on the Lord's Day all servile labor should be abstained from. In 1359 A. D. Islep, Archbishop of Canterbury, issued the following to his clergy respecting the observance of Sunday: "That such of your subjects as are come to years of discretion do go to their parish churches to do, hear and receive what the duty of the day requires of them; and that ye restrain all whatsoever that transgress and rebel in this respect, both in general and particular, with church censures according to the canon." On coming to the throne in 1547, Edward VI issued a proclamation commanding "all the King's faithful and loving subjects to keep their holy day Sunday according to God's holy will and pleasure, in hearing the word of God read and taught, in private and public prayers, in acknowledging their offenses to God and amendment of the same," &c. In 1449, by the 27th of Henry VI, an act was passed prohibiting fairs and markets on Sundays.

Queen Elizabeth commanded that in every parish "three or four discreet men which tender God's glory and His true religion shall be appointed by the ordinances, diligently to see that all the parishioners duly resort to their church upon all Sundays and holy days and there to continue the whole time of the Godly service; and all such as shall be found slack and negligent in resorting to the Church, having no great or urgent cause of absence, they shall straightly call upon them and after due admonition if they amend not they shall denounce them to the ordinary."

The modification and relaxation of the severity of the Puritan influence at this time by Charles I has already been referred to.

The early Puritan idea of Sunday observance in America may be summed up in the enactment of June 10, 1650, passed by the Plymouth General Court: "Further be it enacted that whosoever shall profane the Lord's Day by doing any servile work or any such like abuses shall forfeit for every such default 10 shillings, or be whipped." Profanation of the Lord's Day

included traveling, loitering at the door of a meeting house, drinking in an inn, staying at home instead of attending church; and it was also enacted by the court: "If any, in any lazy, slothful or profane way, doth neglect to come to the public worship of God, he shall forfeit for such default 10 shillings, or be publicly whipped." In Massachusetts, in 1727, funerals, since they induced " great profanation ".of Sunday by traveling of children and servants in the streets, were prohibited except in extreme cases. The bare recital of such austere and coercive measures shows how great has been the tendency to mitigate their severity. Made to-day, they would be regarded not only as fanatical interference with religious freedom, but as intolerable invasions of personal liberty. It is easily comprehensible how they could have been made in an age when an antagonism long since departed existed on the part of the church against the stage. It is a far cry back to the days of William Pyrnne, who, in 1640, in his "Actor's Tragoedie," for his milder term of denunciation calls theatres " devil's chapels," and asserts that the drama " had its origin with the father of all evil "; or since old Jeremy Collier, in 1699, in his " Short View of the Immorality and Profaneness of the English Stage," finds such utter depravity even in music as to say "Musick is almost as dangerous as gun-powder, and, it may be, requires looking after no less than the Press or the Mint." Their reprehension, stern though it was, was in large measure due to the licentiousness and depravity and utter disregard for morality to which it is said the stage had then descended. Happily for us those extreme attitudes have passed away, and instead church and stage, conscious of each other's uplifting influence, have long been correspondingly helpful of each other. The stage and its exponents are well accustomed to that high esteem and well-merited consideration to which their civilizing, ennobling and inspiring force, exhibited alike in the spoken as in the silent drama, by

the living characters and upon the motion-picture screen, justly entitles them.

Under the terms employed in our statute, " Works of necessity and charity," there is expressly included " whatever is needful for the good order, health or comfort of the community " (Penal Law, § 2143.)   Does not the large attendance of our good and law-abiding citizens at our leading theatres, assembled in orderly and intelligent audience to witness the acts there performed, eloquently attest their necessity for the comfort of the community?   Innocent entertainment given under circumstances free from offense to religion and its due observance is always desirable and commendable.   The melancholy experience through which the world is now unhappily passing accentuates the need of preserving rather than destroying all that may properly promote the joy of the community, lighten its burdens and relieve its sadness.   This is especially emphasized when we are reminded that " the Sabbath is made for man, and not man for the Sabbath (Mark ii, 27), and that even in still older days the Sabbath was regarded " as a humane institution, a holiday for the laboring classes."

I find no violation of law established by the evidence in this case.   The motion to dismiss the complaint must therefore be granted.

Complaint dismissed.